## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL DELAWARE, INC., d/b/a GAP
TRUCK STOP, MARCHBANKS TRUCK
SERVICE, INC. d/b/a BEAR MOUNTAIN
TRAVEL STOP, MAHWAH FUEL STOP,
KRACHEY'S BP SOUTH, WALT WHITMAN
TRUCK STOP, INC., on behalf of themselves
and all others similarly situated,

Plaintiffs,

v.

CERIDIAN CORPORATION,
TRAVELCENTERS OF AMERICA LLC, TA
OPERATING LLC, formerly known as TA
OPERATING CORPORATION d/b/a
TRAVELCENTERS OF AMERICA,
TRAVELCENTERS OF AMERICA, INC.,
PETRO STOPPING CENTERS, L.P., PILOT
TRAVEL CENTERS LLC, PILOT
CORPORATION, and LOVE'S TRAVEL
STOPS & COUNTRY STORES, INC.,

Defendants.

Civil Action No.

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiffs allege as follows based upon personal knowledge as to matters relating to themselves, and upon information and belief as to all other matters:

### NATURE OF THE CASE

1.      Plaintiffs, like the members of the classes they seek to represent (defined below), are independent truck stops. The majority of the approximately 3,000 truck stops in the United States are run by independent operators ("Independent Truck Stops" or the "Independents"). The remaining truck stops are owned and/or operated by a small number of national and regional truck stop chains, which are each networks of multiple truck stops either owned by a single entity or

franchisees of that entity ("Truck Stop Chains" or "Chains"). The Defendants, other than Ceridian Corporation ("Ceridian"), are all of the major multi-state Truck Stop Chains other than the Chain operated by Flying J, Inc. (the "Chain Defendants"). Flying J is not a party to this action. Each of the Chain Defendants was composed of at least sixty truck stop locations at all relevant times, and all but one was composed of more than one-hundred separate locations at all relevant times. This case arises out of a similar set of facts and circumstances as a related case these Plaintiffs have brought as a proposed class action against Comdata Network, Inc. d/b/a Comdata Corporation. *See Universal Delaware, Inc., et al. v. Comdata Corporation*, Case No. 2:07-cv-01078-JKG (E.D. Pa.). Comdata is a wholly owned subsidiary of defendant Ceridian. On information and belief, Ceridian authorized, controlled and participated in the conduct at issue in this Complaint, and is directly liable for the damages incurred by Plaintiffs and the proposed Classes (defined below).

2.      Trucking companies or fleets ("Fleets") contract with third parties to provide truck drivers with fleet payment cards ("Trucker Fleet Cards" or "Fleet Cards") to pay for diesel fuel and other items at truck stops across the country. Ceridian's wholly owned subsidiary, Comdata, is the dominant issuer of Trucker Fleet Cards. This case arises out of Defendants' anticompetitive scheme involving, in part, agreements in unreasonable restraint of trade, in violation of Sections 1 and 2 of the Sherman Antitrust Act (the "Scheme"). Defendants' Scheme, which involved benefits flowing to the Chain Defendants, had the ultimate intent and effect of illegally maintaining and enhancing Comdata's monopoly power which Comdata used to charge artificially inflated transaction fees to the Independents.

3.      As a part of the Scheme, Comdata implemented a two-tier pricing system under which Comdata dramatically increased the transaction fees for processing Trucker Fleet Cards to

the Independent Truck Stops, while charging the Chain Defendants much lower fees, giving the Chain Defendants a substantial competitive advantage vis à vis the Independents. As a result of the anticompetitive Scheme alleged herein, Comdata and Defendants succeeded in erecting artificial barriers to the entry and expansion of rival Fleet Card issuers, thereby maintaining sufficient market power for Comdata to continue to charge its artificially inflated transaction fees to the Independents profitably without losing market share to rivals.

4.      Trucker Fleet Cards are processed at truck stops on computerized point-of-sale transaction systems ("Fleet Card POS systems") specially designed for accepting and processing Trucker Fleet Card transactions. Comdata owns and operates the dominant Fleet Card POS system in the United States.

5.      Trucker Fleet Cards look like consumer credit cards and similarly allow their holders to make purchases without exchanging cash. But unlike other payment cards or systems, Trucker Fleet Cards provide special benefits to companies that operate trucks ("Truck Fleets" or "Fleets" or "Truckers"), including the ability to (a) transmit data at the point of sale that can be used to monitor the locations, fuel usages, and other key information (including information relating to state fuel taxes and the like) about individual trucks ("Data Capture"), and (b) limit the types of items that truck drivers may purchase and amounts that may be spent ("Purchase Controls"). Long-haul Fleets travel long-distances and travel "over-the-road" typically through multiple states on interstate highways, in heavy-duty trucks on trips lasting days or weeks. The unique Fleet Card features described above are specifically demanded by long-haul Fleets. The Purchase Control and Data Capture features are a key reason why Trucker Fleet Cards and the Fleet Card POS systems that process those cards compete in markets distinct from other payment cards (including consumer credit cards), methods, and systems.

3

6.    This case arises from Comdata's and Defendants' anticompetitive conduct in the markets for (i) Trucker Fleet Cards, (ii) Fleet Card POS systems, and (iii) Truck Stops. There is also a relevant submarket for Fleet Card transactions at Independent Truck Stops ("Independent Submarket"). Comdata has monopoly power in the markets for Trucker Fleet Cards, Fleet Card POS systems, and the Independent Submarket. The Chain Defendants are powerful players in the Truck Stops market. The Chain Defendants are also actual and potential rivals to Comdata in the Fleet Card market and Independent Submarket because the Chain Defendants have the potential to provide Fleet Card services of their own, or to expand nascent Fleet Card projects to compete with Comdata. Indeed, Ceridian and Comdata themselves consider the Chain Defendants as horizontal competitors. As Ceridian's February 2007 10-K states, "Comdata competes with truck stops and other service centers that offer similar products and services."

7.    As more fully detailed below, Comdata abused its monopoly power in the Fleet Card market, the Independent Submarket, and the Fleet Card POS systems markets by enlisting the Chain Defendants—who are both Comdata's customers and Comdata's actual and potential horizontal competitors in the Fleet Card market—to engage in the anticompetitive Scheme alleged herein, which has included the following elements, among others:

(a) Beginning in or about the year 2000, Comdata entered into a *quid pro quo* with the Chain Defendants. Comdata imposed a two-tier transaction fee pricing scheme under which the Chain Defendants are charged a relatively low flat fee of under $1 per transaction, while the Chain Defendants' Independent rivals are saddled with a high percentage-based fee of around 2% or more per transaction, which amounted to, at minimum, an effective 500-1000% differential in pricing. The two-tier pricing has put the Independents at a significant competitive disadvantage relative to the Chain Defendants. In exchange, the Chain Defendants agreed to enhance and

4

support Comdata's dominance in the Fleet Card Market and Independent Submarket by (i) refusing to accept the rival TCH Fleet Card, (ii) agreeing not to issue Fleet Cards of their own or to promote or expand their own Fleet Cards in competition with Comdata, and (iii) agreeing to certain restrictive contractual provisions designed to limit competition in the Fleet Card market and Independent Submarket.

(b)  Comdata entered into separate written agreements with each of the Chain Defendants beginning as early as 2001 that included a variety of contractual restrictions that were designed to, and did, maintain and enhance Comdata's monopoly power and market dominance, including provisions that, *inter alia*:

(i) required the Chain Defendants to offer all Fleets in the Comdata "Fuel Network" or carrying the Comdata Fleet Card a fuel discount that had to be at least as large as the maximum discount the Chain extended to a Fleet in a rival "Fuel Network" using a rival Fleet Card (referred to herein as the "Fuel Discount Most Favored Nations" or "Fuel Discount MFN" clause).  This provision impaired the ability of rival Fleet Cards to offer Fleets overall fuel purchase costs lower than Comdata could offer Fleets, despite the fact that Comdata charged systematically higher transaction fees to the Independents and the Chain Defendants than did nearly all of its Fleet Card rivals;

(ii) required the Chain Defendants not to pay higher transaction fees to any Fleet Card issuer than it pays to Comdata (referred to as the "Transaction Fee Most Favored Nations" or "Transaction Fee MFN" clause).  This provision effectively blocks the truck stop from accepting certain rival Fleet Cards with business models that impose higher fees (but offer other advantages). When combined with other similar contractual restrictions, including the Fuel Discount MFN, the Transaction Fee MFN prevents rival Fleet Cards from competing with Comdata for Fleet business,

and discourages and restricts the growth of the Chain Defendants' own respective nascent Fleet Card businesses and in-house accounts;

(iii) barred "active sales efforts" to convert Comdata Fleet Card holders to any other Fleet Card network, including to one of the Chain Defendants' own Fleet Cards or in-house accounts. Given that Comdata was and is the dominant Fleet Card issuer held by the vast majority of Fleets and Truckers, this restriction on converting customers severely impaired the growth of the Chains' own Fleet Cards and prevented and impaired efforts by Fleet Card rivals to encourage the Chain Defendants to promote rival fuel networks and Fleet Cards; and,

(iv) prohibited the Chain Defendants from imposing surcharges on Comdata transactions or steering truck stop customers (*i.e.*, Fleets) to rival cards using financial incentives such as rebates or discounts. These contracts also required that Comdata's Fleet customers receive the lowest posted diesel fuel price at truck stops. These provisions, which were agreed to by the Chain Defendants, individually and collectively, insulated Comdata from transaction fee price competition, and thereby restricted competition in the Fleet Card market and Independent Submarket by preventing the Chain Defendants from passing on the higher costs of Comdata's Fleet Cards and the lower costs of Comdata's Fleet Card rivals.

(c) Comdata imposed exclusionary and restrictive contractual provisions on the Independent Truck Stops, provisions which were, in large part, more onerous versions of many of the provisions in the Chain Defendants' Comdata contracts as summarized in ¶ 7(b)(i)-(iv) above, including Fuel Discount and Transaction Fee MFN provisions, restrictions on converting customers to rival Fleet Cards, and bans on steering, surcharging, and rebating. Given Comdata's market dominance and monopoly power, and the necessity to Independents of carrying the Comdata Fleet Card because of

its predominance among Truckers and Fleets, the Independents had no real choice but to accept the terms (and fees) that Comdata dictated.

(d) Comdata imposed exclusionary loyalty provisions in its contracts with Fleets, including discounts conditioned on a Fleet's use of the Comdata Fleet Card for most or all Fleet purchases.

(e) Comdata programmed its dominant Fleet Card POS system so as not to facilitate processing of one significant rival Fleet Card issued by TCH (for example, by impairing the Data Capture and Purchase Control features), impeding TCH's ability to compete.

8.    Comdata and the Defendants conspired to and did unreasonably restrain trade through the anticompetitive contractual provisions described above and other aspects of the Scheme. The Scheme maintained and preserved Comdata's monopoly power in the Trucker Fleet Card market and Independent Submarket, and thereby maintained Comdata's ability to impose artificially inflated and exorbitant fees on the Independents.

9.    The anticompetitive conduct alleged herein constitutes an unlawful scheme and conspiracy to acquire and maintain monopoly power in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Each agreement in furtherance of Defendants' Scheme, including the *quid pro quo* and each contract containing exclusionary provisions, constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, as does the Scheme as a whole. The Defendants' conduct has had the purpose and effect of allowing Comdata to maintain and enhance its monopoly power and charge supracompetitive prices to Plaintiffs and the proposed classes of Independent Truck Stops, and otherwise to cause harm to competition more generally.

## JURISDICTION AND VENUE

10.    The claims set forth in this Complaint arise under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and seek treble damages pursuant to Section 4 of the Clayton Act (15

7

U.S.C. § 15(a)). In addition, Plaintiffs seek injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26). This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11.    Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 because (a) Defendants reside, transact business, committed an illegal or tortious act, have an agent, and/or are found in this District, (b) Plaintiff Universal Delaware, Inc. operates the Gap Truck Stop, located at 54 Route 41, Gap, PA 17527, in this District, (c) Plaintiff Walt Whitman Travel Stop, Inc. operated its Independent Truck Stop in Philadelphia, PA in this District for a large part of the period relevant to this Complaint, and (d) a substantial portion of the events described below have been carried out in this District.

## PARTIES

### PLAINTIFFS

12.    Plaintiff Universal Delaware, Inc. operates the Gap Truck Stop, an Independent Truck Stop, in Lancaster County, Pennsylvania, within the Eastern District of Pennsylvania. During the Class Periods defined below, the Gap Truck Stop accepted Trucker Fleet Cards issued by Comdata, paid fees directly to Comdata, and was injured by paying higher fees due to the illegal conduct described herein.

13.    Plaintiff Marchbanks Truck Service, Inc. d/b/a Bear Mountain Travel Stop is an Independent Truck Stop located in Bakersfield, California. During the Class Periods defined below, Plaintiff Marchbanks Truck Service, Inc. accepted Trucker Fleet Cards issued by Comdata, paid fees directly to Comdata, and was injured by paying higher fees due to the illegal conduct described herein.

14.    Plaintiff Mahwah Fuel Stop is an Independent Truck Stop located at 131 State Route 17, Mahwah, New Jersey, 07430, and is incorporated in the State of New Jersey. During

the Class Periods defined below, Plaintiff Mahwah Fuel Stop accepted Trucker Fleet Cards issued by Defendants, paid fees directly to Comdata, and was injured by paying higher fees due to the illegal conduct described herein.

15.     Plaintiff Krachey's BP South is an Independent Truck Stop located at 1910 South Marquette Road, Prairie do Chien Wisconsin 53821. During the Class Periods defined below, Krachey's BP South accepted Trucker Fleet Cards issued by Comdata, paid fees directly to Comdata, and was injured by paying higher fees due to the illegal conduct described herein.

16.     Plaintiff Walt Whitman Truck Stop, Inc. was an Independent Truck Stop in Philadelphia, Pennsylvania. During the Class Periods defined below, Walt Whitman Truck Stop, Inc. accepted Trucker Fleet Cards issued by Comdata, paid fees directly to Comdata, and was injured by paying higher fees due to the illegal conduct described herein.

**DEFENDANTS**

17.     Defendant Ceridian Corporation ("Ceridian") is a multi-billion dollar, global business services company incorporated in Delaware with its principal place of business located at 3311 East Old Shakopee Road, Minneapolis, MN 55425.

18.     Ceridian acquired Comdata as a wholly owned subsidiary in 1995. In past years, Comdata's revenue constituted approximately 30 percent of Ceridian's total revenue, and nearly 60 percent of Ceridian's Earnings Before Interest and Taxes ("EBIT"). Comdata has been termed Ceridian's "cash cow" in news reports.  On information and belief, Ceridian authorized, controlled and participated in the conduct at issue in this Complaint, and is directly liable for the damages incurred by Plaintiffs and the proposed Classes (defined below).

19.     Defendant Ceridian's mid-1990s strategic acquisitions enabled Comdata to gain monopoly power in the Fleet Card POS systems, the Trucker Fleet Card market, and the

Independent Submarket. After acquiring Comdata in 1995, Ceridian immediately acquired Trendar Corporation ("Trendar") in March of that same year. Trendar was in the business of providing computerized hardware and software to truck stops for processing sales to their customers throughout the United States. Trendar had developed a universal Fleet Card POS system device that was used in thousands of U.S. truck stops at the time, as well as a proprietary communications network. Trendar also provided data collection services to Fleets. In 1997, Ceridian merged Trendar into Comdata. Comdata now carries out the business of Trendar.

20.    In 1998, Ceridian swapped Comdata's gaming service operations to First Data Corporation in exchange for First Data's transportation service business, NTS. NTS, like Comdata, was engaged in the business of providing Fleet Card services to long-haul Fleets. Ceridian's purchase of NTS for Comdata is what initially created Comdata's monopoly in the Fleet Card market and Independent Submarket. Ceridian later acquired Stored Value Systems in 1999, making Comdata the largest provider of stored value cards in the United States. On information and belief, following these acquisitions, Ceridian maintained direct control over Comdata's operations, including decisions concerning Comdata's illicit, exclusionary conduct described herein.

21.    Defendant TravelCenters of America LLC is a publicly owned limited liability corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 24601 Center Ridge Road, Suite 200, Westlake, Ohio. TravelCenters of America LLC, through its wholly owned subsidiaries TA Operating LLC, formerly known as TA Operating Corporation, and TravelCenters of America, Inc., owns, operates and franchises truck stops throughout the United States. TravelCenters of America LLC, TA Operating LLC, TravelCenters of America, Inc., and TA Operating Corporation are collectively referred to in this

Complaint as "TA." TA transacts business in 41 states, including Pennsylvania, and holds itself

out as the largest full-service "travel center" Chain in the United States with approximately 150

truck stops. In 2005, Fortune magazine estimated that TA had gross revenues of approximately

$2.4 billion.

22.     Defendant Petro Stopping Centers, L.P. ("Petro") is a wholly owned subsidiary of

Defendant TravelCenters of America LLC.   Petro is headquartered in Westlake, Ohio.   Prior to

its acquisition by Defendant TravelCenters of America LLC, Petro operated or franchised at least

69 truck stops in 33 states, including Pennsylvania. TravelCenters of America LLC acquired

Petro on May 31, 2007, but continues to operate Petro as a separate brand. As of December 31,

2008, TA's business included 233 sites, 166 of which were operated under the "TravelCenters of

America" or "TA" brand names and 67 that were operated under the "Petro" brand name.

23.     Defendant Pilot Travel Centers LLC is a Delaware limited liability company with

its principal place of business at 5508 Lonas Drive, Knoxville, TN.  Pilot Travel Centers LLC

transacts business in 39 states, including Pennsylvania, with nearly three hundred separate truck

stop locations. Pilot Travel Centers LLC is owned by Defendant Pilot Corporation, which owns a

52.5% interest, and by CVC Capital Partners, which owns the other 47.5% interest.  Defendants

Pilot Travel Centers LLC and Pilot Corporation are referred to collectively herein as "Pilot." Pilot

holds itself out as the largest seller of over-the-road diesel fuel in the United States. In 2004, Pilot

had annual revenues of approximately $7.2 billion.

24.     Defendant Pilot Corporation owned and operated truck stops before the formation

of Pilot Travel Centers LLC in 2001. In addition, public information from Hoover's Company

Records indicates that the following individuals currently are officers of both Pilot Corporation

and Pilot Travel Centers LLC, and have been since Pilot Travel Centers LLC was formed: James

11

A. ("Jimmy") Haslam III (CEO of Pilot Corporation and President of Pilot Travel Centers LLC);

Mark A. Hazelwood (EVP, Direct Sales and Development for both); Ken Parent (SVP, Operations

for both); and Mitch D. Steenrod (CFO for Pilot Corporation and SVP and CFO for Pilot Travel

Centers LLC).  Pilot Travel Centers LLC currently uses Pilot Corporation's domain name of

www.pilotcorp.com to provide information about Pilot Travel Centers LLC's operations.  On

information and belief, Jimmy Haslam and Mark Hazelwood have been aware of and participated

in the unlawful acts alleged in this Complaint that are attributed to Pilot.  Their unlawful actions

should be imputed to both Pilot Corporation and Pilot Travel Centers LLC.

25.    Defendant Love's Travel Stops & Country Stores, Inc. ("Love's") is an Oklahoma

corporation with its principal place of business in Oklahoma City, Oklahoma.  According to its

website (www.loves.com), Love's has owned and operated more than 200 truck stops in 31 states,

including Pennsylvania.

## CLASS ALLEGATIONS

26.    Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a), 23(b)(2),

and 23(b)(3) on behalf of themselves and two overlapping classes of Independent Truck Stops, a

"Ceridian Class" and a "Chain Defendant Class," defined as follows:

> **Ceridian Class:**  All Independent Truck Stops in the United States that paid any transaction fees on Trucker Fleet Card transactions, which were computed based on a percentage of sales, directly to Comdata or any of its subsidiaries at any time from March 2003, until the effects of Defendants' anticompetitive conduct cease (the "Ceridian Class Period");

> and

> **Chain Defendants Class:**  All Independent Truck Stops in the United States that paid any transaction fees on Trucker Fleet Card transactions, which were computed based on a percentage of sales, directly to Comdata or any of its subsidiaries at any time from May 2005, until the effects of Defendants' anticompetitive conduct cease (the "Chain Defendants Class Period").

The Classes shall not include Flying J, Inc., the Chain Defendants, nor any of their respective parents, employees, subsidiaries, affiliates, and franchisees. The only difference between the class definitions is that the Ceridian Class Period extends back to March 2003, whereas the Chain Defendants Class Period extends back only to May 2005.

27.    Membership in each of the Classes is so numerous that joinder is impracticable. Each of the Classes includes thousands of Independent Truck Stops.

28.    There are numerous questions of law and fact common to each of the Classes, including, without limitation:

a.    whether the Fleet Card market, the Independent Submarket, the Truck Stop market, and the Fleet Card POS systems market are the markets relevant to this case;

b.    whether Comdata possesses monopoly power in the Fleet Card market, the Independent Submarket, and the Fleet Card POS systems market;

c.    whether, through the conduct alleged herein, Ceridian and Comdata willfully acquired, maintained and enhanced monopoly power;

d.    whether Defendants conspired to engage in unlawful exclusionary conduct to impair the opportunities of rivals in the Trucker Fleet Card market and the Independent Submarket;

e.    whether Defendants entered into the *quid pro quo* described in this Complaint;

f.    whether Defendants entered into exclusionary agreements that unreasonably restrained trade and impaired Comdata's Fleet Card rivals; and,

g.      whether, and to what extent, Defendants' conduct caused Independent Truck Stops to pay supracompetitive prices or fees and, thereby, to suffer antitrust injuries.

29.    These and other common questions of law and fact predominate over any questions affecting only individual Class members.

30.    Plaintiffs' claims are typical of the claims of the Classes because all members of each Class suffered antitrust injury in the same way as a result of Defendants' wrongdoing, and the claims of each member of each Class arise out of the same essential facts and are based on the same legal theories.

31.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes.

32.    Plaintiffs have retained counsel experienced in class action antitrust litigation, and Plaintiffs have no interest in this litigation that conflicts with the interests of the other members of the Classes.

33.    A class action is superior to any other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty for the Court in managing the claims of the Classes that would preclude class certification.

## INTERSTATE COMMERCE

34.    During all or part of the Ceridian Class Period, Defendant Ceridian offered its products and services to Fleets and truck stops operating in a continuous and uninterrupted flow of commerce across state lines throughout the United States.  During all or part of the Chain Defendants Class Period, the Chain Defendants offered their services and products to Fleets operating in that same flow of commerce.

35.     At all material times, Defendants conducted business across state lines and sold their services to customers located nationwide.

36.     During all or part of the Ceridian Class Period, Ceridian transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the relevant markets.

37.     During all or part of the Chain Defendants Class Period, the Chain Defendants transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the relevant markets.

38.     Defendants employed the United States mails and interstate telephone lines, as well as means of interstate travel, in furtherance of the conduct alleged herein.

39.     Defendants' conduct alleged herein has substantially affected interstate commerce.

## MONOPOLY POWER IN RELEVANT MARKETS

40.     The relevant markets to this case are:

**The Trucker Fleet Card Market.** The market in the United States for specialized Trucker Fleet Cards that provide to trucking companies operating long-haul, heavy duty trucks at least the following functions: credit or facilitation of direct billing by truck stops to the trucking companies for purchases made by truckers; convenient means of payment; transaction security; widespread acceptance at truck stops; specialized data collection services; the ability of trucking companies to exercise control over trucker purchases; and factoring services for accounts receivable.

**The Fleet Card POS Systems Market.** The market for providing to truck stops in the United States universal point-of-sale computer systems that are capable of the following: processing transactions using commercially available Trucker Fleet Cards; verifying authorization of Trucker Fleet Card transactions; collecting and transmitting data (*e.g.*, location, date, and gallons of fuel) while processing Trucker Fleet Card transactions; and imposing restrictions on purchases made with Trucker Fleet Cards.

15

**The Truck Stop Market**. The market for selling diesel fuel, meals and other supplies at on-route facilities to long-haul, over the road, drivers of heavy-duty tractor-trailer trucks transporting freight on the interstate highway system.

41.     There is also a relevant submarket of the Fleet Card market limited to Fleet Card transactions at Independent Truck Stops ("Independent Submarket"). Comdata has been able to charge supracompetitive prices in this market profitably for an extended period of time without losing market share.

42.     Each of these markets is limited geographically to the United States.

43.     Comdata has monopoly power in the Trucker Fleet Card market, the Independent Submarket, and the Fleet Card POS systems market.

### The Fleet Card Market and The Independent Submarket

44.     Long-haul "over the road" Fleets and drivers who work for Fleets, operate heavy duty tractor-trailer trucks that transport enormous volumes of freight throughout the United States. Long-haul Truckers generally purchase diesel fuel, meals, and other supplies and services at truck stops while traveling. Long-haul "over the road" Fleets require extensive Purchase Control and Data Capture features that are offered exclusively by Trucker Fleet Cards.

45.     During point-of-sale transactions Trucker Fleet Card companies collect and transmit purchase information and other data from truck drivers (buying fuel and other products at the truck stop) to their respective Fleets. This data is ordinarily transmitted as part of a transaction in which the Trucker Fleet Card is used to pay the truck stop. The Fleet Card company either supplies the credit for ("funds") the transaction or bills the Fleet directly ("direct bill" or "unfunded") on behalf of the truck stop. For unfunded transactions, the Fleet Card is being used for its Data Capture and Purchase Control features.

46.     The Trucker Fleet Card companies typically are called "third party credit" or "third party billing" companies because they generally do not themselves provide goods or services to the Trucker at the point of sale.

47.     The information that the Trucker Fleet Card companies collect and transmit as part of their Data Capture function enables Truckers and Fleets to monitor and track such things as the location of their trucks, the timing and amount of fuel and other purchases, and other similar information desired by Fleets. Long-haul Fleets rely on such information to control costs, account for purchases, pay appropriate fuel and other taxes, and plan effective use of their assets and employees. Trucker Fleet Cards also provide Fleets and drivers with negotiated or discounted diesel fuel prices and other benefits, including administration of discounts and rebates.

48.     Trucker Fleet Cards, through their Purchase Control functions, enable Fleets and Truckers to limit the dollar amount and type of purchases individual truck drivers can make. Fleet Card Purchase Controls also help Fleets and truck stops prevent the unauthorized use of Fleet Cards.

49.     Traditional credit cards that merely provide credit for a fuel purchase—and do not also provide enhanced Data Capture and Purchase Controls to trucking companies (or administration of fuel discounts or rebates)—are not included in the Trucker Fleet Card market relevant to the antitrust claims asserted in this action. Because consumer credit cards such as, *e.g.*, VISA, MasterCard, American Express, Diner's Club and Discover, do not provide Data Capture or Purchase Control, nor do they serve long-haul Fleets for diesel purchases, they are not part of the Trucker Fleet Card market relevant here. Also for this reason, payments for fuel by cash are not part of the relevant Trucker Fleet Card market.

50.    The Federal Trade Commission (the "FTC") has concluded: "Because of the specialized features of [Trucker Fleet Cards], traditional credit cards and other types of fleet cards are not acceptable substitutes." FTC Analysis of Proposed Consent Order to Aid Public Comment, Sept. 9, 1999, *available at* http://www.ftc.govlos/1999/09/ceridiananalysis.htm.

51.    Comdata charged Independents transaction fees for its Fleet Cards at prices that were and are substantially above marginal costs. Comdata has enjoyed high profit margins on these transactions.

52.    Comdata has, and has exercised, in conspiracy with Ceridian and the Chain Defendants, the power to impair and exclude competition in the Trucker Fleet Card market and Independent Submarket.

53.    The relevant Fleet Card market and Independent Submarket are each limited to those Fleet Card issuers that serve the long-haul "over the road" Fleets and Truckers. Ceridian's 2007 10-K filing states that "Comdata believes that it is the leading provider of transaction processing, financial services and regulatory compliance services to the long haul fleets." Comdata's website includes a timeline that indicates that in 1981, Comdata's Fleet Card became "the first fuel purchase card for the long-haul trucking industry to offer electronic data capture and information management services."

54.    Comdata is by far the dominant provider of Trucker Fleet Cards in the Fleet Card market and Independent Submarket. Comdata's website states that as far back as 1987 the "Comdata Card evolve[d] into an industry standard, providing interactive data management and reporting to more than 100,000 professional drivers and their companies." Even one year after entering into a consent decree in the year 2000 designed to ameliorate Comdata's anticompetitive behavior (discussed below), Comdata still dominated the Trucker Fleet Card market with a 70%

market-share. *See Flying J, Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 825 (10th Cir. 2005) ("*Flying J*"). Comdata maintains at least that market share today in the Fleet Card market, and on information and belief, the Independent Submarket. Moreover, Comdata's next largest Trucker Fleet Card competitor has a market share of less than 20%.

55.    Comdata possesses the ability to preclude or delay new entry into the Trucker Fleet Card market and Independent Submarket, to raise rivals' costs in those markets, to impair the opportunities and efficiencies of rivals, and to control prices and exclude competition.

56.    Truck stops must obtain authorization from Comdata to accept Comdata Fleet Cards. Comdata typically requires that any agreements authorizing Independents to accept Comdata Fleet Cards be terminable at will, without cause, and on either short notice or without any notice. Because of Comdata's dominance among Truckers and Fleets, Independent Truck Stops, indeed all truck stops, would be at a significant competitive disadvantage in seeking Trucker and Fleet business if they could not accept Comdata Fleet Cards. Comdata, thus, has Independent Truck Stops—individually and collectively—at its mercy, and exercises its monopoly power to exclude competition and extract artificially inflated fees from the Independents.

57.    Comdata also has the power to influence the volume of fuel sales at truck stops. For example, Comdata creates fuel networks that provide fuel discounts to trucking companies at specified truck stops that use Comdata services. The vast majority of long-haul Fleets carry the Comdata card. Comdata uses the dominance of its fuel network to steer Truckers to certain favored truck stops, enhancing Comdata's economic power over the truck stops.

**Fleet Card POS Systems Market**

58.     Truck stops cannot process Trucker Fleet Cards unless they acquire Fleet Card POS systems, which are computer devices that facilitate Fleet Card transactions as well as perform Data Capture and Purchase Control (and other administrative) functions.  More specifically, Trucker Fleet Card POS systems have the capacity to:  authorize payment promptly; provide Data Capture and transaction processing to third parties, including legal fuel tax receipts; restrict purchases by Truckers (Purchase Controls); administer fuel discounts where applicable; generate reports, including audit trail reports; and relay transaction data from the truck driver to the Trucker Fleet Card company.  A Trucker Fleet Card company receives the transaction data that is captured by the POS system so that it can relay that data back to the Fleet for whom the card was issued.  A truck stop needs only to retain the data necessary for financial settlement with the Trucker Fleet Card company.

59.     Beginning in approximately 1985, Trendar Corporation developed a popular Trucker Fleet Card POS system for truck stops (the "Trendar System").  Ceridian acquired Trendar in 1995 for Comdata and, since that time and up until recently, Comdata has controlled as much as 90% of the Fleet Card POS systems market.  *Flying J*, 405 F.3d at 825 ("Comdata had secured approximately 90% of the point-of-sale systems market by 2001.  Virtually every major U.S. truck stop other than Flying J used the Trendar System.").

60.     Comdata both issues Trucker Fleet Cards to its Fleet customers and processes Trucker Fleet Card transactions through its Fleet Card POS systems that it leases to truck stops.

61.     Comdata has the power to maintain supracompetitive prices in the Trucker Fleet Card market, the Independent Submarket, and the Fleet Card POS systems market.  This power equates to the power to raise price substantially above the competitive level without losing so

much sales volume as to render the price increase unprofitable. A significant, non-transitory price or fee increase by Comdata would not cause a significant loss of its sales to competitors in the Trucker Fleet Card market, the Independent Submarket, or the Fleet Card POS systems market.

62.     Barriers to entry in the Fleet Card market, the Fleet Card POS systems market, as well as to the Independent Submarket, are high. This is so in the Trucker Fleet Card market and Independent Submarket because, *inter alia*, of a "chicken and egg" problem: prospective market entrants must offer a card widely accepted by truck stops in order to be attractive to Trucker Fleets, and widely accepted by Fleets in order to convince truck stops to accept the card and pay associated transaction fees. The Trucker Fleet Card market is also costly and difficult to enter given the necessary technologies involved, which would require a substantial fixed cost investment. There are also significant barriers to entry in the Trucker Fleet Card POS systems market because, *inter alia*, prospective market entrants must be able to accept Comdata Fleet Cards, given their prevalence among Fleets, and therefore must seek and obtain authorization from Comdata to process Trucker Fleet Cards issued by Comdata. There is a "chicken and egg" problem in the Fleet Card POS system market too: prospective entrants would need to have a presence in a substantial number of truck stops in order to convince Trucker Fleet Card companies to authorize processing over the new Fleet Card POS System.

**The Truck Stop Market**

63.     Truck stops are located throughout the United States, primarily adjacent to the interstate highway system, including state turnpike systems. Truck stops supply diesel fuel, trucking supplies, food and services (such as, *e.g.*, showers, overnight parking, food, check cashing, internet service, truck repair, etc.) to Fleets, including long-haul over-the-road Fleets, and their truck drivers. The Truck Stop market is composed of Chains (including the Chain

21

Defendants and Flying J) and Independents.  Truck stops accept Trucker Fleet Cards and have Fleet Card POS systems on site for processing those cards.

**PAST EFFORTS TO STOP DEFENDANTS'
ANTICOMPETITIVE CONDUCT HAVE FAILED**

64.    Comdata and Ceridian secured their dominant positions in the markets for Trucker Fleet Cards, the Independent Submarket, and the market for the Fleet Card POS systems that process those cards, through Ceridian's aggressive acquisition strategy in the mid- to late-1990s on Comdata's behalf.  During that time period Ceridian acquired, *e.g.*:  (1) Trendar Corporation (in 1995) to solidify Comdata's dominance in the Fleet Card POS systems market; and (2) NTS (from First Data Corporation in 1998) to solidify Comdata's dominance in the Trucker Fleet Card market.

65.    Following these acquisitions, both the FTC and Flying J (a Chain that owns a company that issues the rival TCH Fleet Card) each filed complaints against Comdata and Ceridian alleging, *inter alia*, that the acquisitions described above constituted violations of the antitrust laws.

66.    The FTC brought an enforcement action specifically charging, *inter alia*, that the acquisitions of Trendar and NTS "may substantially to lessen competition and to tend to create a monopoly in the relevant markets in violation of Section 7 of the Clayton Act" by increasing the likelihood that customers of Fleet Cards and Fleet Card POS systems "will pay higher prices."  The FTC complaint noted the high barriers to entry in both markets and explained, "Prospective entrants into the market for provision of [Trucker Fleet Cards] must be accepted onto [Comdata's] Trendar [POS] system and must establish a nationwide network of truck stop locations that accept their cards.  Potential entrants into the [POS] market must be able to process [Comdata's] fleet cards in order to be viable options for truck stops."  FTC Complaint, *In the Matter of Ceridian*

*Corp.*,    No.    3933,    April    5,    2000,    *available    at*
http://www.ftc.gov/os/2000/04/ceridiancomplaint.htm.

67.    The FTC analysis concluded that Comdata had used its monopoly power to preclude or delay competition from rivals:

> Comdata . . . has the ability to preclude or delay new entry into the fleet card market, and to discipline or disadvantage new entrants or incumbent providers of fleet cards who seek to compete effectively with Comdata, by denying them access to Trendar's POS system or by granting access only on discriminatory terms. The investigation revealed evidence that Comdata has delayed or denied some fleet card competitors access to Trendar and Comdata has increased the fees to other firms for Trendar access.

FTC Analysis of Proposed Consent Order to Aid Public Comment, September 9, 1999, *available at* http://www.ftc.gov/os/1999/09/ceridiananalysis.htm.

68.    The FTC concluded further that: "The market for the provision of fleet card services for over-the-road trucking companies is highly concentrated. Comdata controls the majority of that market and, with its acquisition of NTS, is more than five times larger than its nearest competitor. At the time of its acquisition, NTS was Comdata's closest competitor in the market for fleet card services for over-the-road trucking companies." *Id.*

69.    According to the FTC, Ceridian's acquisitions for Comdata (including Trendar and NTS) violated antitrust laws "because they gave Comdata the power to control entry into, and expansion by existing providers in, both the [Fleet Card POS systems and Trucker Fleet Card markets]." FTC Press Release, "Final Approval Granted in FTC Consent Agreement with Nation's Largest Trucking 'Fleet Card' Issuer," April 6, 2000, *available at* http://www.ftc.gov/opa/2000/04/ceridiancorp.htm.

70.    Comdata entered into a consent decree with the FTC that became final in April 2000. The consent decree required Comdata, *inter alia*, to process transactions involving rivals'

Trucker Fleet Cards on Comdata's Trendar System and to allow (through royalty-free licenses) three new providers of Fleet Card POS systems to process Comdata-issued Trucker Fleet Cards.

71.     Since that time, Comdata has issued three licenses to potential Fleet Card POS system-provider competitors, but none of those competitors currently competes with Comdata in the Fleet Card POS systems market. Two potential competitors apparently ceased competing in the Fleet Card POS systems market, and Comdata entered into a joint marketing agreement with the third would-be competitor, whose product was incorporated into Comdata's OmniDesq Fleet Card POS system.

72.     The FTC's enforcement activities did not succeed in depriving Comdata of its monopoly power in the Trucker Fleet Card market, the Independent Submarket, or the Trucker Fleet Card POS systems market, nor was the FTC able to prevent Comdata from abusing its monopoly power in league with the Chain Defendants and Ceridian as alleged in this Complaint. Indeed, having only been partially thwarted in its monopolization efforts by the FTC, Comdata turned increasingly to conspiring with the Chain Defendants (through the *quid pro quo* involving the two-tier pricing at issue here), and the exclusionary contractual provisions described herein, to maintain and increase its monopoly power in the Trucker Fleet Card market and Independent Submarket.

73.     Flying J owns a subsidiary that issues a Trucker Fleet Card for long-haul Fleets (the TCH Fleet Card) that attempts to compete with Comdata's Trucker Fleet Card. TCH LLC, which issues the TCH-branded Trucker Fleet Cards, is 75 percent owned by Flying J. The TCH Fleet Card charges a $1 flat fee per transaction for all transactions, whether they are processed at Chains or Independents. In 1996, Flying J filed a lawsuit against Comdata challenging Comdata's anticompetitive and exclusionary conduct under the antitrust laws.

74.    In 2001, Comdata settled with Flying J, agreeing to pay Flying J $49 million and to grant prospective relief, including two licenses intended to facilitate the use of the TCH Fleet Card on Comdata's monopoly Trendar Fleet Card POS system in truck stops.

75.    Flying J later brought a legal challenge to Comdata's implementation of the settlement agreement, arguing that Comdata had failed to abide by the agreement, and that in so doing, Comdata had hampered TCH's ability to compete with Comdata in the Trucker Fleet Card market.

76.    The trial court agreed with Flying J that Comdata had breached the settlement agreement.

77.    On appeal, the Tenth Circuit recognized the underlying anticompetitive conduct in which Comdata had engaged:

> When Flying J entered the [Trucker Fleet Card] market in the mid-1990s, it faced two significant barriers to entry. First, the Trendar System did not accept the [Flying J-issued] TCH Fuel Card. Merchants using Trendar could not process TCH Fuel Card transactions; therefore, Flying J customers could not use the TCH Fuel Card at Trendar locations. Given the ubiquity of the Trendar System, this was a big problem for Flying J. Second, *the record shows that Comdata engaged in a campaign to pressure truck stops not to accept the TCH Fuel Card. . . . Comdata placed over four hundred telephone calls to truck stops and threatened to raise transaction fees on Comdata cards if they agreed to accept the TCH Fuel Card.*

*Flying J*, 405 F.3d at 827 (emphasis added).

78.    Nevertheless, the Tenth Circuit reversed the trial court, concluding that the settlement agreement did not require Comdata to open up the market for Trucker Fleet Cards in the way that Flying J had argued. The dissent, however, noted the conditions of the market:

> This case is a dispute over a claim that Comdata violated antitrust laws by restricting Flying J's access to the market. On the eve of trial, because Comdata realized it was in jeopardy of an adverse judgment, it agreed to pay forty-nine million dollars to Flying J to compensate for past violations. In addition, to rectify future restrictions on market entry, it entered into the license that is the subject of the dispute on appeal. . . . What we do know is that the overall purpose of the license was to open access to

the market. . . . The district court's selection of the interpretation that favors optimal opening of the competitive market seems to me to be eminently reasonable.

*Flying J*, 405 F.3d at 838 (McKay, J., dissenting).

79.    The settlement between Flying J and Comdata, like the FTC consent decree, has not protected Independent Truck Stops from anticompetitive conduct, particularly in the Fleet Card markets. Moreover, having failed to exclude the TCH Fleet Card from the Fleet Card market and Independent Submarket through the use of Comdata's dominant Fleet Card POS system, and having agreed to forego continuing its past pattern of exclusionary conduct, Comdata soon embarked on a new scheme and conspiracy to maintain and enhance its monopoly power through unreasonable restraints on competition in the Fleet Card markets—employing new, but no less effective, exclusionary tactics. Since the time of the Flying J litigation (and the FTC's past efforts to preserve Fleet Card market competition), as described in more detail below, Comdata has increasingly relied on agreements with the Chain Defendants, and other exclusionary agreements and conduct, to foreclose Fleet Card rivals and increase its monopoly power at the direct expense of the Independents.

## DEFENDANTS' ONGOING ANTICOMPETITIVE CONDUCT

80.    Comdata abused its monopoly power in the Fleet Card market, the Independent Submarket, and the Fleet Card POS systems market by enlisting the Chain Defendants, who are both Comdata's customers and Comdata's actual and potential horizontal competitors in the Fleet Card market and Independent Submarket, to engage in an anticompetitive scheme (the "Scheme"), including the following elements, among others:

A.    **Comdata's Anticompetitive *Quid Pro Quo* With The Chain Defendants to Restrict Competition in the Trucker Fleet Card Market and Independent Submarket**

81.    Beginning in or about the year 2000, Comdata entered into in to a *quid pro quo* with the Chain Defendants, and each of them, in which Comdata agreed to impose a two-tier transaction fee pricing scheme under which the Chain Defendants are charged a relatively low flat fee of under $1 per transaction while the Chain Defendants' Independent Truck Stop rivals are saddled with a high percentage-based fee of up to 2.5% per transaction. Before the *quid pro quo*, Comdata had charged a lower flat transaction fee to all truck stops, including the Independents. Under the prior fee system, not only were the fees lower generally, but there was also a far smaller disparity between the transaction fees to the Independents and the transaction fees to the Chain Defendants.

82.    The groundwork for the *quid pro quo* was laid at various meetings between senior executives from Comdata and Pilot and at national trade shows in the years just before the two-tier pricing was implemented.

83.    As a result of this two-tier pricing scheme, Comdata was effectively charging the Independents 500 to 1000% more than Comdata charged the Chain Defendants per transaction, even though Comdata's costs in providing Fleet Card transaction services to the Chains and Independents could not possibly justify such a pricing disparity. For instance, the credit risks assumed by Comdata for processing "funded" transactions at the Independents and the Chain Defendants are virtually identical. As part of the *quid pro quo*, Comdata also agreed with the Chain Defendants, in writing, that the Chain Defendants would be assured of receiving the lowest transaction fees offered to any entities accepting Comdata's Trucker Fleet card.

84.    For their part, the Chain Defendants agreed, in exchange, to enhance and support Comdata's dominance in the Fleet Card Market and Independent Submarket by (i) refusing to accept the rival TCH Fleet Card, (ii) foregoing opportunities, and deferring ongoing efforts, to issue new Fleet Cards in competition with Comdata, (iii) refraining from promotion of their existing Fleet Cards or in-house accounts, and (iv) agreeing to restrictive contractual provisions designed to limit their support for, and use of, competing Fleet Cards issued by Comdata's other Fleet Card rivals.

85.    By keeping at least one rival Fleet Card from being accepted at the Chain Defendants, limiting the growth and expansion of other Fleet Card rivals, and blocking the Chain Defendants from growing or promoting their own rival Fleet Cards, the *quid pro quo* restricted competition in the Fleet Card market and Independent Submarket.

86.    Historically, prior to the *quid pro quo*, Comdata had charged truck stops, including Independents, a flat fee of approximately $0.35 to $1.00 per transaction.

87.    Beginning in approximately 2000, as part of the Scheme, Comdata began to implement its two-tier pricing arrangement. Under the Scheme, Comdata continues to charge a flat rate transaction fee to the Chain Defendants, but imposed much higher fees—calculated as a percentage of the total dollar amount of each purchase transaction—on Independent Truck Stops. The percentage usually varies from 1.7% to 2.5% of the total purchase amount. Given that filling up an average long-haul truck diesel fuel tank costs hundreds of dollars—tanks can exceed 100 gallons—filling up a tank of diesel fuel at $3.00 per gallon could easily cost $300. For an Independent saddled with a 2.5% fee, Comdata's processing charge for that transaction could be $7.50 or more, while the Chain Defendants would pay $0.65 or less for that same transaction— even if that transaction were with the same Fleet. Accordingly, the two-tier scheme results in

28

Independents paying 500 to 1000 percent (or higher) more than the Chain Defendants, and multiple times more than the Independents had paid before the Scheme. Indeed, because the Independents are subject to a percentage based fee and the Chain Defendants pay a flat rate, the transaction fees for the Independents, but not the Chain Defendants, automatically ratcheted up substantially, without a cost basis when diesel fuel prices skyrocketed during the time period relevant to this case. For example, when diesel prices recently reached $5 per gallon, the transaction fees to the Independents grew commensurately—with per transaction costs as high as $12.50 (or more) while the Chain Defendants continued to pay less than $1 for the exact same service. This huge disparity has clearly impaired the Independents' ability to compete with the Chain Defendants.

88.    As part of this conspiracy, the Chain Defendants also agreed not to accept the TCH Fleet Card and not to issue and convert customers to one of their own Trucker Fleet Cards (or in-house accounts) or to other rival Fleet Cards. When Comdata adopted the two-tier pricing scheme, the TCH card—which has always charged a $1 flat transaction fee to all truck stops—could have put competitive pressure on Comdata's ability to preserve artificially inflated fees. The Defendants' Scheme eliminated that threat, as well as other competitive threats that could otherwise have come from other rival Fleet Cards, including in-house Fleet Cards that had been or could have been issued or expanded by the Chain Defendants themselves.

89.    Comdata, through its agreements with the Chain Defendants, has attempted to impair, and has succeeded in impairing, the entry, growth and success of competitors, like TCH, by leveraging Comdata's monopoly power in the relevant markets and engaging in a scheme involving both punishments and rewards.

90.     These punishments involved Comdata threatening the Chain Defendants with high transaction fees and steering Fleets away from the Chain Defendants to rival truck stops if they (or any of them) accepted the TCH card, issued or promoted their own Fleet Cards, or promoted the expansion of other rival Fleet Cards.

91.     The *quid pro quo* between Comdata and each of the Chain Defendants included the following:  an agreement by the Chain Defendants not to accept the TCH card, not to issue or promote its own Fleet Card, not to attempt to convert Comdata Fleet customers into customers of its own or rival Fleet Cards, and agreeing to other restrictive contractual provisions that helped Comdata maintain dominance in the Fleet Card market and Independent Submarket.  In exchange, the Chain Defendants would benefit by (a) continuing to be charged the flat-rate transaction fees and be subject to Comdata's steering of Fleets to the Chain Defendants, and (b) the Independent Truck Stops would be placed at a competitive disadvantage to the Chain Defendants and would be unable to compete effectively because of the high percentage-based transaction fees Comdata would impose on the Independents.

92.     As part of the Scheme, Comdata, Pilot, and the other Chain Defendants agreed to take measures to prevent TCH and other rival Trucker Fleet Cards, including the Chain Defendants' own internal Fleet Cards, from gaining market share or challenging Comdata's market dominance.  For example, before Comdata settled litigation with Flying J in 2001, it placed over four hundred telephone calls to truck stops, threatening to raise transaction fees on Comdata Fleet Cards if they began accepting TCH Fleet cards.

93.     Comdata's two-tier pricing structure was established, in part, as a means to reward the Chain Defendants for their agreement not to accept the TCH card, and not to steer or convert purchasers to rival Trucker Fleet Cards or in-house accounts.

94.    Through the *quid pro quo*, Comdata was able to enlist the Chain Defendants in its efforts to impose and sustain artificially inflated transaction processing fees to the Independent Truck Stops.  The Scheme is effectuated in part through Comdata's contracts with the Chain Defendants, as discussed immediately below.

**B.    Comdata and the Each of the Chain Defendants Entered into Written Agreements Containing Competitive Restrictions With the Intent and Effect of Maintaining and Enhancing Comdata's Monopoly Power**

95.    Comdata entered into separate written agreements with each of the Chain Defendants beginning as early as 2001 that included a variety of contractual restrictions that were designed to, and did, impair and exclude Fleet Card rivals, including actual and potential Fleet Cards from the Chain Defendants themselves, and maintain and enhance Comdata's monopoly power and market dominance.

96.    The Chain Defendants knew that entering into these written agreements with Comdata would assist Comdata in maintaining and enhancing its monopoly power.

97.    Some of the restrictive contractual provisions in contracts with the Chains involve the use (and abuse) of fuel networks.  After consideration of levels of diesel fuel consumption, geography and the protected status of the Chain Defendants, Comdata creates a fuel network for an individual Fleet.  For joining the Comdata fuel network, the Fleet secures an across-the-board fuel discount off of the posted price (typically expressed per gallon of fuel) that each participating truck stop is required to honor.  Comdata's ability to select fuel network truck stop members or steer Truckers to certain truck stops gives Comdata the power to steer business to those truck stops that assist Comdata in its anticompetitive scheme, *i.e.*, the Chain Defendants.

98.    Furthermore, Comdata and the Chain Defendants agreed, through written contracts between Comdata and the Chain Defendants, that the Chain Defendants would offer all Fleets in

the Comdata "Fuel Network," or carrying the Comdata Fleet Card, a fuel discount at least as large as the maximum discount each of the Chains extended to a Fleet in a rival "Fuel Network" using a rival Fleet Card. This Complaint refers to these particular contractual restrictions as "Fuel Discount Most Favored Nations" or "Fuel Discount MFN" provisions. These provisions severely impaired the ability of rival Fleet Cards to offer Fleets overall fuel prices lower than those Comdata could offer, despite Comdata's systematically higher transaction fees to the Chain Defendants and especially to the Independents.

99.    Fuel Discount MFNs provided, in effect, that the Chain Defendants could not offer any significant discount to a Fleet that used a rival Trucker Fleet Card, including one of the Chains' own Fleet Cards. As a result of this contractual agreement, for a truck stop to offer a fuel discount to a Fleet using a rival Trucker Fleet Card or one of the truck stop's own Fleet Cards, the truck stop would need to offer *all* of Comdata's Fleet Card holders the same level of fuel discount, even those Comdata Fleet Card holders with smaller discounts. Comdata served Fleets of all sizes with different fuel requirements and different levels of fuel discounts. As a result of the Fuel Discount MFN, if a Chain were to offer a substantial discount to a single Fleet using a rival Fleet Card, all of Comdata's Fleets and Truckers—even those with low discounts or none at all—would then be entitled to that substantial discount the Chain offered to that single Fleet using the rival Fleet Card. In effect, the Fuel Discount MFN imposed a substantial penalty on a truck stop's offering fuel discounts to Truckers using rival Fleet Cards. A discount to a single large Fleet using a rival card or a Chain's own Fleet Card would disproportionately raise the aggregate fuel discount obligations of the truck stop not just to that Fleet, but potentially to all or many of Comdata's customers—without any additional commitments or compensation from the Comdata customers receiving the higher fuel discounts.

100.    The Fuel Discount MFN thus made it economically impossible for a rival Fleet Card to build a robust rival Fuel Network, or to attract large Fleets to switch from Comdata to their Fleet Card using the promise of substantial discounts at the Chain Defendants' truck stops. In this way, the Fuel Discount MFN suppressed price competition, blocked and impaired the Chain Defendants from dealing with rival Fleet Cards and Fuel Networks, raised rivals' costs, and enhanced Comdata's market dominance and monopoly power.

101.    The Chain Defendants and Comdata also agreed in written contracts that the Chain Defendants would not pay higher transaction fees to any Fleet Card issuer than to Comdata (referred to as the "Transaction Fee Most Favored Nations" or "Transaction Fee MFN" provision). This provision effectively blocks the Chain from accepting certain rival Fleet Cards with business models that may impose higher fees but offer other advantages. When combined with other similar contractual restrictions, including the Fuel Discount MFN, the Transaction Fee MFN prevents rival Fleet Cards from competing with Comdata for Fleet business, and discourages the growth of the Chain Defendants' own respective nascent or potential rival Fleet Cards and in-house billing businesses.

102.    Unlike a typical MFN, which guarantees *payment* of the *lowest* price, the Transaction Fee MFN guarantees that Comdata will *receive* the *highest* transaction fees of all the Trucker Fleet Cards accepted at a truck stop. The Transaction Fee MFN clause serves as a backstop to Comdata's restrictions on the fuel discounts that the Chain Defendants can offer Fleets that use a rival Trucker Fleet Card (*i.e.*, to the Fuel Discount MFN). Comdata's restrictions on efforts by the Chain Defendants to offer fuel discounts to Fleets using rival Fleet Cards would be less effective if the truck stop could offer financial incentives to Fleets using rival Fleet Cards indirectly instead of directly through lower fuel prices. For instance, without the Transaction Fee

MFN, truck stops could offer such incentives by agreeing to pay higher transaction fees to the rival Trucker Fleet Card—in place of discounts on fuel paid directly to the Fleet—part of which would then be paid (by the Trucker Fleet Card company) to the Fleet.

103.    The Transaction Fee MFN prevents rival Fleet Cards and a Chain Defendant's own Fleet Card from attracting business with a combination of lower overall transaction and fuel pricing.  If the Chain tried to pay higher transaction fees to a rival Trucker Fleet Card as part of a larger pricing strategy, the transaction fees on *all* of Comdata's transactions—*i.e.*, the majority of the truck stop's transactions—would be raised to that higher level.  Thus, the Transaction Fee MFN, both standing alone, and in combination with the Fuel Discount MFN, created severe economic disincentives to any possible efforts by the Chain Defendants to promote or expand business with rival Trucker Fleet Cards or a Chain's own Fleet Card as a means to challenge Comdata's market dominance.

104.    During 2004 and early 2005, Comdata sought to enforce its Transaction Fee MFN clause against Pilot.  Comdata sued Pilot in state court in Knoxville (Davidson County), Tennessee (Case No. 04-2904-IV), concerning fees Comdata claimed were owed to it under the contract in effect between them.  Paragraph 10 of Comdata's Amended Complaint in this dispute with Pilot filed December 17, 2004 references one of the most favored nations clauses, and specifically alleged: "pursuant to the Agreement, Pilot is obligated to pay fees to Comdata that are equal to the fees Pilot pays to any other third party billing company. Pilot has not paid Comdata fees equal to the fees it pays other third party billing companies."  Pilot responded, in part, by arguing that Comdata's attempted enforcement of the Transaction Fee MFN provision constituted an anticompetitive attempt to restrict Pilot from doing business with a rival Fleet Card issuer, known as FleetCor (d/b/a FuelMan).  Pilot stated that Comdata's attempts to enforce the MFN

34

provision in this way violated the federal antitrust laws. Pilot and Comdata subsequently agreed to keep this provision in place.

105.    Comdata's agreements with each of the Chain Defendants also barred these Chains from "active sales efforts" to convert Comdata Fleet Card holders to any other Fleet Card network, including to one of the Chain Defendants' own Fleet Cards or in-house accounts, which—given that Comdata was and is the dominant Fleet Card issuer held by the vast majority of Fleets and truckers —severely restricted the growth of the Chains' own Fleet Cards and in-house accounts and prevented and impaired efforts by Fleet Card rivals to encourage the Chain Defendants to promote their rival networks.

106.    Moreover, beginning as early as 2003, Comdata agreed with one or more Chain Defendants, including at least Pilot (then the largest Chain Defendant), to charge its highest transaction fees to any and all Independent Truck Stops that went into business or began accepting Comdata's Fleet Card after 2001.

107.    Moreover, given that the restriction provides that Comdata must charge a transaction fee, "pro-rata," commensurate with the merchant's transaction volume, it guarantees that Independent Truck Stops that began accepting Comdata after 2001 would be charged a high rate whether or not the rate is cost justified or competitively set, and whether or not the truck stop is a member of a cooperative buying group that can aggregate volume among its membership.

108.    This provision also reflects Comdata's agreement to charge the Independents more than the Chain Defendants as part of the *quid pro quo* (described above) in that it implicitly reflects the parties' understanding that Comdata would set its transaction fees "pro rata" based on transaction volume. In other words, this is a reflection of the parties' understanding and

agreement that the Chain Defendants would be charged a low flat rate and the Independents charged a much higher percentage rate.

109.    Comdata further agreed with one or more Chain Defendants that it would offer its lowest transaction fees for transactions from Fleets that convert from doing direct bill through a rival Fleet Card to direct bill through Comdata, and a much higher transaction fee for transactions by Fleets that convert from a funded transaction through Comdata to a direct bill transaction. These provisions created incentives for the Chains to: (a) convert their own direct bill business to Comdata funded business, thereby turning over the Fleet customer relationship to Comdata; and (b) convert rival Fleet business to Comdata.

110.    Comdata's contracts with the Chain Defendants also included additional exclusionary provisions prohibiting each of them from:

      a.    surcharging their customers when they use Comdata Fleet Cards, even if Comdata's cards have higher transaction fees;

      b.    steering or converting Fleet customers to rival cards, such as by granting rebates to their customers when customers use cards issued by Comdata's rivals, in-house payment accounts with the truck stops;

      c.    taking Comdata's "payment instruments" à la carte, which prohibition thereby conditions acceptance of Comdata's Fleet Card on acceptance of other Comdata payment cards and methods, including Comdata's "ComChek" cards and other payment methods, and *vice-versa*.

111.    These bans on surcharging, steering or converting prevent truck stops from passing along the cost savings associated with use of rival cards or payment systems to their Trucker customers.

112.    Comdata has used all of these contractual provisions as "belt and suspenders" to its efforts to prevent its rivals from breaking into the Fleet Card market and expanding use and acceptance of their rival Fleet Cards by Truckers and Fleets. The intended purpose and effect of these agreements is to insulate Comdata from price competition from rival Fleet Cards. Given that the decision of which card to use is that of the Fleets, these provisions help insulate the Fleets from some of the costs associated with using a Comdata Fleet Card, and thereby protect Comdata from rivals' efforts to use lower transaction costs as a means to gain market entry and expansion. Put another way, these provisions restrict truck stops from encouraging customers to use the Trucker Fleet Cards of Comdata's rivals and thus help preserve and maintain Comdata's market dominance.

113.    Taken together, Comdata's anticompetitive contractual provisions in its contracts with the Chain Defendants have blocked Comdata's Fleet Card rivals from expanding beyond a relatively small market share. Comdata has been able to block rival expansion and growth in the Fleet Card market and Independent Submarket, despite having fees systematically higher than its Fleet Card rivals and despite the notoriously bad customer service and outmoded technologies.

114.    All of the exclusionary contractual provisions described in this Complaint serve to maintain and enhance Comdata's monopoly power, and result—by themselves, and in conjunction with the other aspects of the monopolization Scheme and conspiracy alleged herein—in Comdata's imposition of artificially inflated prices on Plaintiffs and the Classes.

### C.    Comdata Imposed Exclusionary Contractual Provisions on Independent Truck Stops

115.    Comdata used its market dominance to impose exclusionary and restrictive contractual provisions on all of the Independent Truck Stops, including, *e.g.*, MFN provisions, restrictions on converting customers to rival Fleet Cards, and bans on steering, surcharging, and

rebating, and requiring acceptance of all of Comdata's payment methods. Given Comdata's market dominance and monopoly power, and the necessity to Independents of carrying the Comdata Fleet card because of its predominance among truckers and Fleets, the Independents had no real choice but to accept the terms (and fees) that Comdata dictated. Independents must accept Comdata-issued Trucker Fleet Cards or risk losing the substantial percentage of their customers and potential customers that use Comdata Trucker Fleet Cards.

116.    Many of the conditions for accepting the Comdata Fleet Card imposed upon the Independents were, in essence, more restrictive versions of the provisions in the contracts of the Chain Defendants as summarized above.

117.    These exclusionary provisions imposed through the contracts with each of the Independent Truck Stops, by themselves, and in conjunction with the similarly exclusionary provisions in the agreements with the Chain Defendants, excluded and impaired competition in the Trucker Fleet Card market and Independent Submarket, maintained and enhanced Comdata's dominance and monopoly power, and preserved Comdata's ability to maintain the two-tier pricing scheme, and charge artificially inflated transaction fees to the Independents.

**D.    Comdata's Contracts With Fleets Are Exclusionary**

118.    The Trucker Fleet Card Market is two-sided. The services are sold to both those seeking to make purchases and those seeking to make sales using Trucker Fleet Cards. Increased market share on one side increases market power on the other side. Increased demand for a Fleet Card by the Trucker Fleets increases the demand for that card among truck stops. Similarly, acceptance of a card by the truck stops increases demand by the Trucker Fleets.

119.    Comdata, since at least 2001, has used and manipulated its relationships with the Trucker Fleets to preserve and increase its monopoly power with respect to the Independents.

120.    Additionally, Comdata requires that its Trucker Fleet customers commit to use of the Comdata Fleet card services in order to secure the fuel network discounts. The fuel network discounts are administered by Comdata at the Fleet Card POS System, and require the use of the Comdata Fleet card. Trucker Fleets' compliance with volume commitments associated with the fuel network discounts are also monitored by Comdata through the Trucker Fleets' use of Comdata Fleet cards at truck stops.

121.    Comdata's contracts with Fleets include incentives that require the Fleets to complete a very high percentage of their transactions using a Comdata card. Comdata has been granted audit rights to ensure compliance. These restrictive contractual provisions in the Fleet contracts increase Comdata's market power with truck stops, enable Comdata to reward Chain Defendants (and thus entice the Chain Defendants to support Comdata's exclusionary conduct) and to punish Independents, by charging the Independents supracompetitive transaction and other fees.

**E.    Monopoly Leveraging With Comdata's Dominant Fleet Card POS System**

122.    Comdata has leveraged its monopoly power in the Trucker Fleet Card POS systems market to exclude and impair rival issuers from the Trucker Fleet Card market.

123.    By the late 1990s, following its acquisition of the Trendar POS system (through purchases by Ceridian), Comdata dominated that Fleet Card POS systems market for processing Trucker Fleet Cards.

124.    When Flying J sought to enter the Trucker Fleet Card market with its TCH-brand Trucker Fleet Card, Comdata programmed its Trendar POS system not to process transactions for customers using the TCH card.

125.    Trucking companies and their truck drivers had limited use for a new Trucker Fleet Card that would not be widely and easily accepted at the nation's truck stops. Because of Comdata's exclusionary conduct, trucking companies had little incentive even to try the TCH card, regardless of lower pricing or other features and benefits offered. "Merchants using Trendar could not process TCH Fuel Card transactions; therefore, Flying J customers could not use the TCH Fuel Card at Trendar locations. Given the ubiquity of the Trendar System, this was a big problem for Flying J." *Flying J*, 405 F.3d at 827 (emphasis added).

126.    Comdata's decision not to process TCH transactions on the Trendar POS system erected an unreasonably high barrier to entry for Flying J. Comdata controlled the key to entry to the market—access to transaction processing on the Trendar POS system—and effectively locked the TCH card out of the Trucker Fleet Card market by leveraging its monopoly power in the Fleet Card POS systems market.

127.    Flying J filed suit against Comdata for unlawfully leveraging its monopoly power to impair Flying J's ability to compete in the Trucker Fleet Card market.

128.    Comdata paid Flying J $49 million and agreed to prospective relief—including agreeing to permit TCH and other potential competitors access to its Fleet Card POS system—to settle the lawsuit filed by Flying J and a companion suit filed by the FTC.

129.    However, despite these settlements, Comdata has continued to leverage its dominance in the market for Fleet Card POS systems to impair competition in the market for Trucker Fleet Cards. In particular, Comdata has refused to allow its Trendar system to process the Purchase Controls and Data Capture functions directly through TCH as part of its processing of the TCH MasterCard. If Comdata had programmed Trendar to function in this way, the TCH card could have then been used as a Trucker Fleet Card at the Chain Defendants because the Chain

Defendants accept MasterCard. Comdata's conduct impaired the ability of Comdata's rival, TCH, to compete and enabled Comdata to maintain and enhance its monopoly power in the Trucker Fleet Card market.

130.    Comdata's decision to deny Data Capture and Purchase Controls directly through TCH when processing the TCH Mastercard on Comdata's Fleet Card POS systems has impaired TCH's ability to compete effectively in the Trucker Fleet Card market. As the Tenth Circuit noted about the exclusionary conduct that is an ongoing part of Comdata's Scheme to monopolize: "[The lack of Data Capture and Purchase Controls] on TCH Mastercard processing hinders Flying J's ability to compete in the [Trucker Fleet Card] market." *Flying J*, 405 F.3d at 828.

## CERIDIAN WAS INTEGRALLY INVOLVED IN COMDATA'S ILLICIT, ANTICOMPETIVE BUSINESS DEALINGS

131.    Although Comdata was, in name, a subsidiary of Ceridian, Ceridian and its executives supervised, managed and set policy for Comdata following Ceridian's 1995 acquisition of Comdata. Ceridian's website describes the relationship between Ceridian and Comdata as follows: "through its Comdata subsidiary, *Ceridian* is a major payment processor and issuer of credit cards, debit cards and stored value cards, primarily for the trucking and retail industries in the United States." (emphasis added).

132.    Ceridian established Comdata as the dominant player in the Trucker Fleet Card market, Independent Submarket, and the Fleet Card POS systems market through a series of targeted acquisitions throughout the 1990s. Specifically, in March 1995, Ceridian acquired the Trendar Corporation for Comdata. One of Trendar's assets was the then-dominant Fleet Card POS system. Trendar also owned and operated the "FDIS" system, which was a direct billing system that competed with Trucker Fleet Cards. In addition to the Trendar acquisition, in the

1990's Ceridian acquired numerous other issuers of Trucker Fleet Cards, including TIC, EDS, Fleet Services, Saunders, Inc., CCIS and NTS, Inc., in a successful effort to make the Comdata subsidiary the dominant Trucker Fleet Card provider.  At the time of Ceridian's purchase of NTS for Comdata in 1998, NTS was Comdata's closest Fleet Card rival.

133.    After establishing Comdata as the dominant industry player in these markets, Ceridian oversaw, directed and remained extensively involved in Comdata's business operations. Ceridian executives set Comdata's rates and policies in accordance with Ceridian's financial needs and business plan.  In February 2006, for instance, Comdata's CEO Gary Krow and Treasurer Douglas Neve reportedly submitted letters to Ceridian's Board of Directors that detailed mismanagement by Ceridian's former CEO, Ronald Turner, expressed concerns with accounting problems and financial statements that eventually led to SEC investigations, criticized Ceridian's business plans and strategies for Comdata and complained of Ceridian's improper oversight of Comdata. *Pershing Square L.P. v. Ceridian Corp.,* C.A. No. 2780-CC (April 11, 2007 De. Ch. Ct.).

134.    Ceridian directed Comdata to raise the transaction fees Comdata charged truck stops for Fleet Card transactions and to impose the two-tier pricing scheme that formed the basis of the *quid pro quo* alleged in this Complaint.  After Comdata raised its rates beginning in or around 2000, Comdata representatives told certain of the Independents that Ceridian had mandated the transaction fee increases and structural pricing change for Independents.

135.    Ceridian also played an integral role in the formation of the exclusionary agreements that are at the heart of the anticompetitive Scheme.

136.    Ceridian executives also supervised Comdata's day-to-day business operations, including, but not limited to, negotiations concerning transaction fees with truck stops; decisions

about extending credit lines to specific customers; granting rebates to Truckers and Fleets; and managing Comdata's relationship with customers. Furthermore, Comdata routinely notified Ceridian of Comdata's business dealings.

137.    Ceridian's involvement in Comdata's daily business affairs was both extensive and ongoing. Comdata could not extend credit lines to Truckers or Fleets without Ceridian's express authorization.

138.    In some cases, Ceridian bypassed Comdata altogether and negotiated over fees directly with truck stops or truck stop agents.

139.    Ceridian also actively managed Comdata's relationship with truck stop operators. For example, Ceridian consistently communicated with the Chain Defendants concerning Comdata's performance and encouraged them to register any complaints about Comdata directly with Ceridian. Ceridian was thus extensively involved in the business of Comdata and specifically in fundamental aspects of the Scheme set out in this Complaint.

## HARM TO COMPETITION DUE TO THE SCHEME AND EACH OF ITS ELEMENTS

140.    The unlawful anticompetitive actions described in this Complaint maintained and increased Comdata's monopoly power, giving Comdata the ability to artificially increase transaction fees to Independent Truck Stops and maintain those artificially inflated fees through the present and continuing. This harm to the Independents in the form of artificially high transaction fees, is sufficient by itself to constitute harm to competition under the antitrust laws. To the extent relevant, the Scheme alleged in this Complaint had other competitive harms as well. As a result of the higher fees to Independents, Independent Truck Stops have higher costs, and are

less robust rivals to the Chain Defendants than they otherwise would be. As the Independents become less competitive, the Chain Defendants are able to raise their diesel and other prices.

141.    Other than the artificially inflated transaction fees to the Independents, the anticompetitive effects of the Scheme alleged herein include, *inter alia*:

      (a)    reduced competition in the Truck Stop market (because Independents are severely limited in their ability to compete);

      (b)    higher retail diesel fuel prices (because Independents are limited in their ability to compete and thereby put downward pressure on prices);

      (c)    output in terms of the number of Fleet Card transactions is lower than it otherwise would be (because Independents are limited in their ability to compete and thereby to provide as many transactions as they otherwise could).

142.    There are no legitimate procompetitive justifications for the anticompetitive Scheme alleged in this Complaint, or for any aspect of the Scheme standing alone, and even if there were, there are less restrictive means of achieving those purported procompetitive effects. To the extent the Scheme or any aspect of the Scheme has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

## ANTITRUST INJURY TO PLAINTIFFS AND MEMBERS OF THE CLASSES

143.    During the Class Periods, Plaintiffs and members of the Classes purchased Trucker Fleet Card processing services from Ceridian and Comdata. As a result of the Chain Defendants' illegal Scheme with Ceridian and Comdata—including exclusionary agreements in unreasonable restraint of trade—members of the Classes were compelled to pay, and did pay, artificially inflated prices or fees for truck stop payment processing, including artificially inflated transaction fees.

144.    If actual and potential Fleet Card issuers, including the Chain Defendants themselves, had not agreed not to enter, or been unlawfully discouraged from entering, the Trucker Fleet Card market and Independent Submarket, or from expanding market share in order to benefit from economies of scale and thus becoming more formidable competitors, Comdata's fees would have been substantially lower, and Independent Truck Stops, including Plaintiffs and the members of the Classes, would have paid Comdata substantially less for Trucker Fleet Card processing.

145.    As a consequence, competition in the Trucker Fleet Card market and the Independent Submarket was substantially harmed, and Plaintiffs and members of the Classes have sustained, and continue to sustain, substantial losses and damage to their business and property in the form of overcharges on transaction fees paid to Comdata.  The full amount of such damages will be calculated after discovery and upon proof at trial.

146.    The conduct comprising Defendants' Scheme is continuing, and so are the overcharges suffered by Plaintiffs and the Classes caused by the Scheme.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:
### Unlawful Agreements in Unreasonable Restraint of Trade

## AGAINST ALL DEFENDANTS

147.    Plaintiffs incorporate by reference the preceding allegations.

148.    As set forth above, in violation of § 1 of the Sherman Act, Comdata and the Chain Defendants, with the active assistance and involvement of Ceridian, entered into a *quid pro quo*, including written exclusionary agreements in unreasonable restraint of trade, under which the Chain Defendants agreed to various exclusionary contractual terms—including a variety of MFN provisions, and agreements not to steer or convert customers to the Chain Defendants' own Fleet

Cards or those of Comdata's rivals—and also agreed not to accept the TCH card. In exchange, Comdata agreed to offer the Chain Defendants its lowest rates and charge the Chain Defendants much lower transaction fees than it charges the Chains' Independent Truck Stop rivals.

149.    These agreements were an unreasonable restraint of trade. The *quid pro quo*, and each of the individual written agreements between the Chain Defendants and Comdata, were between actual or potential horizontal competitors in the Fleet Card market and Independent Submarket and involved agreements to suppress competition with each other in these markets.

150.    Each Defendant has committed at least one overt act—such as entering into multi-year contracts containing exclusionary provisions—to further the conspiracy.

151.    Plaintiffs and members of the Classes have been injured in their business or property by Defendants' antitrust violations. The injury to Plaintiffs and the Classes consists of paying artificially inflated transaction fees for truck stop payment processing, including artificially high per-transaction fees. Such injury, in the form of overcharges, is of the type the antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

### COUNT II
**Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2: Scheme to Monopolize**

### AGAINST DEFENDANT CERIDIAN ONLY

152.    Plaintiffs incorporate by reference the preceding allegations.

153.    As set forth above, in violation of § 2 of the Sherman Act, Ceridian, with the involvement and assistance of the Chain Defendants, acquired, maintained, and enhanced Comdata's monopoly power in the Trucker Fleet Card market and Independent Submarket by engaging in an exclusionary Scheme to monopolize that raised the costs of Comdata's Fleet Card rivals and impaired those rivals' opportunities to compete.

154.    Ceridian intentionally sought to obtain, maintain, and enhance Comdata's monopoly power in the Trucker Fleet Card market and Independent Submarket, beginning with Ceridian's 1990s acquisitions of Comdata's main rivals in the Fleet Card market.

155.    Ceridian included anticompetitive terms in contracts with truck stops, such as bans on surcharges and on steering or converting customers to Comdata's rivals and MFN clauses on transaction fees and fuel discounts.  These terms had the purpose and effect of impairing the opportunities of Comdata's rivals, and raising the costs of those rivals.  As a result, the Scheme has maintained and extended Comdata's monopoly power in the Trucker Fleet Card market and Independent Submarket.

156.    Ceridian further leveraged monopoly power in the Fleet Card POS systems market by refusing to process, and imposing restrictions on processing, rival Trucker Fleet Cards, thereby maintaining and enhancing its monopoly power in the Trucker Fleet Card market and Independent Submarket.

157.    As part of the monopolization Scheme, Ceridian also conspired with the Chain Defendants, whereby Ceridian and Comdata imposed a two-tier pricing scheme, rewarding the Chain Defendants with low rates and imposing high transaction fees on the Independents, and in exchange the Chain Defendants agreed, *inter alia*, not to accept the TCH card and not convert Fleets or Truckers to their own Fleet Cards or in-house accounts.  These actions had the goal and effect of hampering rival entry into, and expansion in, the Trucker Fleet Card market and Independent Submarket, and of maintaining and enhancing Comdata's monopoly power.

158.    Plaintiffs and members of the Cerdian Class have been injured in their business or property by the monopolization Scheme alleged herein.  Plaintiffs' and the Ceridian Class's injuries result from paying artificially inflated fees for truck stop payment processing, including

artificially high per-transaction fees on Comdata-issued Trucker Fleet Cards. Such injuries, in the form of overcharges, are of the type the antitrust laws were designed to prevent, and flow directly from that which makes Ceridian's conduct unlawful.

**COUNT III**

**Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2: Conspiracy to Monopolize**

**AGAINST ALL DEFENDANTS**

159.    Plaintiffs incorporate by reference the preceding allegations.

160.    As set forth above, in violation of § 2 of the Sherman Act, Ceridian and Comdata, with the involvement, assistance, and agreement of the Chain Defendants, acquired, maintained, and enhanced Ceridian's and Comdata's monopoly power in the Trucker Fleet Card market and Independent Submarket by engaging in an exclusionary conspiracy to monopolize that raised the costs of Comdata's Fleet Card rivals and impaired those rivals' opportunities to compete.

161.    Ceridian and Comdata sought to obtain, maintain, and enhance Comdata's monopoly power in the Trucker Fleet Card market and Independent Submarket, beginning with Ceridian's 1990s acquisitions of Comdata's main rivals in the Fleet Card market.

162.    As part of the conspiracy to monopolize, Defendants, and each of them, agreed to anticompetitive terms in contracts with truck stops, such as bans on surcharges and on steering or converting customers to Comdata's rivals and MFN clauses on transaction fees and fuel discounts. These terms had the purpose and effect of impairing the opportunities of Comdata's rivals, and raising the costs of those rivals. As a result of the conspiracy alleged herein, Ceridian and Comdata have maintained and enhanced monopoly power in the Trucker Fleet Card market and Independent Submarket.

163.    As part of the monopolization conspiracy, Ceridian and Comdata conspired with the Chain Defendants, whereby Ceridian and Comdata imposed a two-tier pricing scheme,

48

rewarding the Chain Defendants with low rates and imposing high transaction fees on the Independents, and in exchange the Chain Defendants agreed, *inter alia*, not to accept the TCH card and not convert Fleets or Truckers to their own Fleet Cards. These actions had the goal and effect of hampering rival entry into, and expansion in, the Trucker Fleet Card market and Independent Submarket, and of maintaining and enhancing Ceridian's and Comdata's monopoly power.

164.    Each Defendant has committed at least one overt act—such as entering into multi-year contracts containing exclusionary provisions—to further the conspiracy. Each Defendant intended that the conspiracy to monopolize alleged herein would maintain and enhance Ceridian's and Comdata's monopoly power and injure Plaintiffs and the Classes thereby.

165.    Plaintiffs and members of the Classes have been injured in their business or property in the form of overcharges on transaction processing fees by Defendants' monopolization conspiracy. Plaintiffs' and the Classes' injuries result from paying artificially inflated fees for truck stop payment processing, including artificially high per-transaction fees. Such injuries, in the form of overcharges, are of the type the antitrust laws were designed to prevent, and flow directly from that which makes Defendants' conspiracy unlawful.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following:

A.    Certification of the Classes proposed in this Complaint;

B.    Judgment in favor of themselves and the Classes they seek to represent and against Defendants, and each of them, for damages, measured as the overcharges Plaintiffs and the other members of the Classes paid as a result of Defendants' anticompetitive conduct, trebled;

C.    Pre- and post-judgment interest;

D.    Injunctive relief to prevent further anticompetitive conduct; and

E.    Costs of suit, including reasonable attorneys' fees.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: May 21, 2009

Eric L. Cramer
Ellen Noteware
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Joseph R. Saveri
275 Battery Street, Suite 3000
San Francisco, CA  94111-3339
Tel: (415) 956-1000
Fax: (415) 956-1008

**QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP**
Stephen R. Neuwirth
51 Madison Avenue, 22nd Floor
New York, NY  10010
Tel: (212) 849-7000
Fax: (212) 849-7100

*Plaintiffs' Counsel*